UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LIANG LI,

        Plaintiff,

    v.                                     Case No. 2:26-cv-00962

FLORIDA RESTAURANT
FRANCHISE GROUP XI, LP;
REGIONAL CENTER
MANAGEMENT, LLC; LAKE
BUENA VISTA INVESTMENTS, LLC;
COMMERCENTERS EB5 REGIONAL
CENTER INVESTMENTS, LLC d/b/a
ORLANDO EB-5 INVESTMENTS
REGIONAL CENTER; JAFREJO-CP
INVESTMENTS, LLC; JAFREJO
HOLDINGS, LLC; and ANTHONY
KORDA,

        Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Liang Li ("Plaintiff" or "Li"), by and through undersigned counsel, hereby sues Defendants Florida Restaurant Franchise Group XI, LP ("FRFG XI" or the "Partnership"), Regional Center Management, LLC ("RCM"), Lake Buena Vista Investments, LLC ("LBVI"), Commercenters EB5 Regional Center Investments, LLC d/b/a Orlando EB-5 Investments Regional Center ("Orlando EB-5 Regional Center"), Jafrejo-CP Investments, LLC ("Jafrejo-CP"), Jafrejo Holdings, LLC ("Jafrejo Holdings"), and Anthony Korda ("Korda") (collectively, "Defendants"), and alleges as follows:

1

## I.    INTRODUCTION

1.    This action arises from a fraudulent EB-5 securities offering through which Defendants solicited and obtained Plaintiff's $500,000 capital contribution and $50,000 administrative fee to fund a Lake Buena Vista, Florida restaurant and hotel project, while making material misrepresentations and omissions about project progress, repayment prospects, conflicts of interest, escrow safeguards, and EB-5 program compliance.

2.    Plaintiff brings this action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a); the Florida Securities and Investor Protection Act, Fla. Stat. § 517.301; and Florida common law.

3.    The offering was documented in a Private Placement Memorandum for Florida Restaurant Franchise Group XI, LP (the "PPM"), together with a Subscription Agreement, a Subscription Escrow Agreement, a Security Agreement, and a Promissory Note and later Second Amended and Restated Promissory Note. Plaintiff relied on Defendants' written representations that the General Partner would monitor the Project to completion on time and within budget, that jobs projected for EB-5 compliance were robust, that escrow safeguards would protect investor funds, and that repayment would be supported by operating cash flows from the hotel and restaurant. *See* PPM, pp. 15–16, 23–24, 26, 31–34, 45 (Ex. 1); Subscription Agreement, Sched. of Exhibits and Wire Instructions (Ex. 2); Subscription Escrow Agreement, pp. 1–4, 7–

10 (Ex. 3); Security Agreement (Sept. 1, 2014), pp. 1–7 (Ex. 4); Promissory Note (Sept. 1, 2014) (Ex. 5); Second Amended and Restated Promissory Note (Feb. 25, 2021), pp. 1–2, 5–6 (Ex. 6).

4.    Defendants failed to deliver what they promised. Material facts were misstated, incompletely disclosed, or concealed, including the scope of entrenched conflicts of interest among the General Partner, the escrow agent, the preferred immigration counsel, and the borrower/developer; the use and pledging of investor escrowed funds for bridge financing inconsistent with investor-protection messaging; material changes to the project, financing, hotel brand, and repayment timelines from the original Hampton Inn & Suites by Hilton to a Candlewood Suites by IHG; and the absence of controls sufficient to protect EB-5 immigration outcomes tied to Plaintiff's investment.

5.    Plaintiff's I-526 petition was filed on or about May 28, 2015, and USCIS issued a receipt notice on June 1, 2015, addressed to Plaintiff in care of Anthony Korda of Korda, Zitt and Associates at 2338 Immokalee Road, Suite 137, Naples, Florida 34110, while Defendants continued to represent through written offering materials and subsequent project documents that the project remained viable, EB-5 compliant, and that repayment would follow. *See* USCIS Form I-797C Receipt Notice (June 1, 2015), Receipt Number WAC1590367743 (Ex. 7); PPM, pp. 10–11, 15–16, 23–24, 26, 31–34 (Ex. 1); Second Amended and Restated Promissory Note (Feb. 25, 2021), pp. 1–2, 5–6 (Ex. 6).

6.    Plaintiff pleads with the particularity required by Rule 9(b) of the Federal

Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1)–(2) , the who, what, when, where, and how of each materially false statement and omission and the reasons each was false or misleading when made. As to the "who," each Defendant's specific role in the fraudulent scheme is identified. As to the "what," each material misrepresentation and omission is set forth with pinpoint citations to the offering documents. As to the "when," the chronology of events from the Partnership's formation in August 2014 through the February 2021 amended note is detailed. As to the "where," the Middle District of Florida was the locus of the offering, escrow administration, wire transfers, and project operations. As to the "how," the mechanism of the fraud—the use of conflicted fiduciaries, misleading projections, and concealed material changes—is specified with documentary support.

7.     Plaintiff further pleads, with specificity under Florida law, why fraudulent concealment and equitable tolling apply to any allegations otherwise outside limitations periods, including Korda's ongoing, conflicted roles and continuing representation through at least February 25, 2021, and continuing concealment of material facts that were not reasonably discoverable by Plaintiff. *Nardone v. Reynolds*, 333 So. 2d 25, 37 (Fla. 1976) (recognizing that fraudulent concealment tolls the statute of limitations where defendant engages in acts or practices designed to prevent the plaintiff from learning of facts giving rise to the cause of action).

8.     Plaintiff seeks rescission or compensatory damages under federal and

Florida securities laws, common-law fraud and negligent misrepresentation, breach of fiduciary duty, legal malpractice, breach of contract, unjust enrichment, and related equitable and declaratory relief.

## II.    PARTIES

9.     Plaintiff Liang Li is a foreign national born in 1968, who made an EB-5 investment of $500,000 in FRFG XI and paid a $50,000 administrative fee in reliance on Defendants' Florida-centered offering and immigration representations. Plaintiff's I-526 petition was filed on May 28, 2015, with USCIS assigning priority date May 28, 2015, and preference classification 203 B5 I-526. *See* USCIS Form I-797C Receipt Notice (June 1, 2015) (Ex. 7).

10.    Defendant FRFG XI is a Florida limited partnership formed on August 27, 2014, that offered and sold limited partnership interests to EB-5 investors to finance a Twin Peaks restaurant and hotel project in Lake Buena Vista, Florida. FRFG XI's principal place of business is located at 5621 Strand Boulevard, Suite 202, Naples, Florida 34110, with administrative offices at 2149 N. Commerce Parkway, Weston, Florida 33326. FRFG XI was organized pursuant to the Florida Revised Uniform Limited Partnership Act to make a loan to LBVI. *See* PPM, pp. 4, 9–10, 18 (Ex. 1).

11.    Defendant RCM is a Florida limited liability company that served as FRFG XI's General Partner and the designated escrow agent under the Subscription Escrow Agreement. RCM is owned and operated by Anthony Korda. RCM's principal place of business is located at 5621 Strand Boulevard, Suite 202, Naples, Florida 34110. *See* PPM, pp. 4, 9–11, 15–16, 27 (Ex. 1); Subscription Escrow

5

Agreement, pp. 1, 7–10 (Ex. 3).

12.    Defendant LBVI is a Florida limited liability company that served as the developer and borrower under the EB-5 structure. LBVI is 75% owned by Jafrejo-CP Investments, LLC and 25% owned by STC Associates, LLC. LBVI was the contract purchaser of 12353 Winter Garden Vineland Road, Orlando, Florida 32836, and had rights to construct a national branded hotel and Twin Peaks Restaurant. *See* PPM, pp. 9–10, 15–16, 18, 23–26 (Ex. 1); Security Agreement (Sept. 1, 2014), p. 1 (Ex. 4); Promissory Note (Sept. 1, 2014) (Ex. 5); Second Amended and Restated Promissory Note (Feb. 25, 2021) (Ex. 6).

13.    Defendant Orlando EB-5 Regional Center is a Florida limited liability company designated by USCIS as a regional center on February 28, 2013, under the Immigrant Investor Pilot Program. Its principal address is 1800 Pembrook Drive, Suite 300, Orlando, Florida 32810. It sponsored the Project for EB-5 purposes and provided the platform for indirect job creation modeling upon which Plaintiff relied. *See* PPM, pp. 9–10, 18, 31–34 (Ex. 1).

14.    Defendant Jafrejo-CP is a Florida limited liability company that owned 75% of LBVI, and Defendant Jafrejo Holdings is a Florida limited liability company that managed Jafrejo-CP. Jafrejo-CP and Jafrejo Holdings exercised control over LBVI, the project, financing structure, and use of proceeds, and were integral to decisions material to EB-5 compliance and investor protections. *See* PPM, p. 18 (Ex. 1).

15.    Defendant Korda is an attorney licensed in the State of California (State

6

Bar No. 170974) and formerly based in Naples, Florida. Korda is admitted to practice before numerous courts, including the United States Supreme Court. Korda owned and controlled RCM as principal and General Partner of FRFG XI, signed and administered loan and security documents on behalf of the lender, served as the designated escrow agent, and was named as the "Preferred Immigration Attorney" for investors. Korda's practice focuses on EB-5-related matters and he held himself out as having "successfully filed more than 300 Investor Petitions (I-526), more than 120 Applications to Remove Conditions of Residence (I-829)" with a "100% rate of success." *See* PPM, pp. 9–11, 18, 20, 23–24, 27 (Ex. 1); Subscription Escrow Agreement, pp. 1, 7–10 (Ex. 3); Security Agreement, p. 7 (Ex. 4); Second Amended and Restated Promissory Note, pp. 5–6 (Ex. 6).

### III.    JURISDICTION AND VENUE

16.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and control-person liability under Section 20(a). The Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367.

17.    Personal jurisdiction exists over all Defendants under Florida's long-arm statute, Section 48.193, Florida Statutes, because Defendants transacted business in Florida, committed tortious acts in Florida, and operated a Florida-based offering and project that caused injury within Florida in connection with the offer and sale of securities to Plaintiff. All entity Defendants are Florida limited partnerships or Florida limited liability companies with principal places of business in Florida, and Defendant

Korda maintains his law practice in Naples, Florida.

18.    Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including offering communications, escrow administration at accounts in Naples, Florida, loan and security documentation, and wire transfers to BankUnited, N.A. in Miami Lakes, Florida and J.P. Morgan Chase Bank, N.A. in Naples, Florida. *See* Subscription Agreement, Ex. A (Wire Instructions) (Ex. 2).

## IV.    FACTUAL ALLEGATIONS

### A.    Formation of the Partnership and the Offering Structure

19.    On August 27, 2014, FRFG XI was formed as a Florida limited partnership to raise up to $22,000,000 by selling up to forty-four $500,000 limited partnership units to EB-5 investors. The PPM stated the Partnership would loan investor capital to LBVI to develop a Twin Peaks restaurant and a 156-key Hampton Inn & Suites by Hilton hotel in Lake Buena Vista, Florida. *See* PPM, pp. 4, 9–10, 15–16, 25–26 (Ex. 1).

20.    On September 1, 2014, FRFG XI and LBVI executed a $20,000,000 Promissory Note whereby LBVI, as Borrower, promised to pay FRFG XI, as Lender, Twenty Million Dollars for the purpose of "acquiring the property located at 12353 Winter Garden Vineland Road, Orlando, Florida 32836, and to construct a national branded hotel (i.e Hampton Hotel & Suites) and a Twin Peaks Restaurant." The Note was to be secured by a Security Agreement entered contemporaneously. *See*

8

Promissory Note (Sept. 1, 2014), pp. 1–2 (Ex. 5).

21.     On September 1, 2014, LBVI executed a Security Agreement in favor of FRFG XI granting the Partnership a security interest in project collateral, including project real estate, goods, furnishings, furniture, equipment, fixtures, inventory, and all accounts, deposit accounts, contract rights, and chattel paper. The Security Agreement identified Korda as the signatory on behalf of FRFG XI's General Partner, RCM. *See* Security Agreement (Sept. 1, 2014), pp. 1–2, 7 (Ex. 4).

22.     The PPM identified RCM, controlled by Korda, as FRFG XI's General Partner responsible for, among other duties: (a) determining that Partnership actions are "consistent with the EB-5 Immigrant Investor Program"; (b) "ensuring that the project will likely be a qualifying investment under the EB-5 Pilot Program"; (c) monitoring "the business operations with respect to continuing qualification under the Investor Program"; (d) monitoring "the Florida Restaurant Franchise Group XI, LP's progress in its endeavor to have the Project be completed on time, within budget and according to plans and specifications, along with monitoring the escrow deposits are properly invested in 'safe and sound' investments that will insure preservation of investor capital"; and (e) "oversee[ing] performance of the Escrow Agent." *See* PPM, pp. 15–16 (Ex. 1).

**B.     The Escrow Arrangement and Conflicts of Interest**

23.     The PPM represented that investor funds would be held in an escrow account "controlled by the Escrow Agent/General Partner," with disbursement to the developer upon I-526 filing and approval, but also stated that "all Subscriber funds

held in escrow may be pledged by the Developer to secure interim/bridge financing, provided that all such interim/bridge financing is utilized directly for the development of the Project." The PPM further stated that the "Escrow Agent shall assist [LBVI] to facilitate such interim/bridge financing in any manner that is in the best interest of the Partnership." *See* PPM, pp. 23–24 (Ex. 1).

24.    The Subscription Escrow Agreement, executed "effective as of September 1, 2014" among FRFG XI, RCM as "Escrow Agent," and LBVI, tasked RCM, through Korda, with holding investor capital "in an account at a financial institution maintained and controlled by the Escrow Agent." The Escrow Agreement authorized the Escrow Agent to "invest all Subscription Proceeds, at the written direction of the LP, in a non-interest bearing deposit account at a federally chartered bank." *See* Subscription Escrow Agreement, pp. 1–4 (Ex. 3).

25.    The Subscription Escrow Agreement further provided that "all Subscriber funds in the [Escrow Account] may be pledged and/or hypothecated by the Developer to secure interim/bridge financing," and that "The Escrow Agent shall use its best efforts to assist LBVI to facilitate such interim/bridge financing in any manner that is in the best interest of the LP." Critically, the same individual—Korda—served simultaneously as the principal of the General Partner (RCM), the Escrow Agent, and the "Preferred Immigration Attorney" for investors, creating an inherent, non-waivable conflict of interest. *See* Subscription Escrow Agreement, pp. 3–4, 7–8 (Ex. 3); PPM, pp. 20, 27 (Ex. 1).

26.    The wire instructions in the Subscription Agreement directed investors to

wire the $500,000 subscription price to FRFG XI's account at BankUnited, N.A. in Miami Lakes, Florida (Account Number 9853301085), and to wire the $50,000 administrative fee to RCM's account at J.P. Morgan Chase Bank, N.A. in Naples, Florida (Account Number 201312083). Both wires were directed to Anthony Korda's attention. *See* Subscription Agreement, Ex. A (Wire Instructions) (Ex. 2).

**C.    Representations Regarding Korda's Role and Immigration Success**

27.    The PPM prominently featured Korda as a central figure, describing him as "principal of [RCM]," and naming him as the "Preferred Immigration Attorney" for investors. The PPM touted that "Mr. Korda's practice focuses on EB-5 Related matters and he has successfully filed more than 300 Investor Petitions (I-526), more than 120 Applications to Remove Conditions of Residence (I-829) ... all with a 100% rate of success." *See* PPM, pp. 10–11, 20, 27 (Ex. 1).

28.    The PPM stated that Korda, as the Preferred Immigration Attorney, "has prepared or has assisted with the preparation of the Project I-526 template letter and filing package which will be submitted to USCIS with each Investor's I-526 Petition." Investors who did not use Korda as their immigration attorney could be charged up to $2,500 for the General Partner to review their I-526 petition. *See* PPM, pp. 27–28 (Ex. 1).

29.    The simultaneous roles occupied by Korda—as General Partner, Escrow Agent, lender signatory, and Preferred Immigration Attorney—created non-waivable conflicts of interest that were not adequately disclosed to investors. Korda's financial incentives as General Partner (receiving administrative fees and controlling the

11

Partnership) were fundamentally adverse to his purported duties as immigration counsel for investors and as the Escrow Agent tasked with protecting investor funds.

**D.      Plaintiff's Investment and I-526 Filing**

30.      Between approximately March 2015 and May 2015, after receiving and reviewing the PPM and offering documents, Plaintiff executed subscription documents and wired $500,000 to the FRFG XI account at BankUnited, N.A. in Florida and $50,000 to RCM's account at J.P. Morgan Chase Bank, N.A. in Florida. Plaintiff relied upon Defendants' representations regarding project viability, escrow protections, and immigration success. *See* PPM, pp. 9–11, 26–28, 45 (Ex. 1); Subscription Agreement, Ex. A (Wire Instructions) (Ex. 2).

31.      On or about May 28, 2015, Plaintiff's I-526 petition was filed with USCIS. On June 1, 2015, USCIS issued a Form I-797C Receipt Notice to Plaintiff acknowledging receipt of the I-526 petition. The Receipt Notice identified Plaintiff's case type as "I-526, Immigrant Petition by Alien Entrepreneur," assigned Receipt Number WAC1590367743, and stated the priority date as May 28, 2015, with preference classification "203 B5 I-526." Notably, the Receipt Notice was addressed to "LIANG LI C/O ANTHONY KORDA KORDA ZITT AND ASSOCIATES 2338 IMMOKALEE RD STE 137 NAPLES, FL 34110," confirming Korda's role as Plaintiff's immigration attorney. *See* USCIS Form I-797C Receipt Notice (June 1, 2015) (Ex. 7).

**E.      Material Changes to the Project and the 2021 Amended Note**

32.      Contrary to the representations in the PPM, which described the project

12

as a "156-key Hampton Inn & Suites by Hilton," the project underwent material changes that were not adequately disclosed to investors. The Second Amended and Restated Promissory Note dated February 25, 2021, revealed that the hotel brand had been changed from Hampton Inn & Suites by Hilton to "Candlewood Suites by IHG®," and that the project now included a parking garage not contemplated in the original offering. *See* Second Amended and Restated Promissory Note (Feb. 25, 2021), p. 1 (Ex. 6).

33. The Second Amended and Restated Promissory Note further revealed that the original principal amount had been increased from $20,000,000 to $21,500,000 (reflecting three additional EB-5 investors) and then decreased to $21,000,000 after one investor's I-526 petition was denied and $500,000 was released from escrow. The Note amended the maturity date "to extend the maturity date of this Second Amended Note for one (1) year for all Limited Partners because of the worldwide Covid-19 pandemic." *See* Second Amended and Restated Promissory Note (Feb. 25, 2021), pp. 1–2 (Ex. 6).

34. Significantly, the Second Amended and Restated Promissory Note was consented to by "Anthony Korda, on behalf of its GP, Regional Center Management, LLC." Korda's continued exercise of control over the Partnership through at least February 25, 2021, demonstrates his ongoing involvement in and control over the investment structure. This continuing representation and control is directly relevant to tolling analysis under Florida law. *See* Second Amended and Restated Promissory Note (Feb. 25, 2021), pp. 5–6 (Ex. 6).

35. The changes reflected in the 2021 Amended Note—including the change in hotel brand, the addition of a parking garage, the modification of principal amount, and the extension of maturity—were material alterations to the investment that were not disclosed to Plaintiff in a manner consistent with the PPM's representations about monitoring, oversight, and timely completion.

**F.   The Structural Conflicts of Interest Among Buena Vista Projects and Entities**

36. Defendants' conflicts of interest extended beyond Korda's multiple roles to the structural relationships among the various Buena Vista entities. RCM, controlled by Korda, served as General Partner of FRFG XI while simultaneously serving as Escrow Agent, creating a conflict in which Korda controlled both the entity seeking to deploy investor funds and the entity tasked with safeguarding those funds pending I-526 approval.

37. The PPM disclosed that LBVI "is 75% owned by Jafrejo-CP Investments, LLC, a Florida limited liability company managed by Jafrejo Holdings, LLC," and acknowledged that "The Developer is the majority owner of the Borrower and its principals are one and the same." This incestuous structure meant that the borrower and developer were effectively controlled by the same principals, undermining the independence that would ordinarily exist in an arm's-length lending relationship. *See* PPM, p. 18 (Ex. 1).

38. The PPM further disclosed that "The General Partner does not have any duty to account to the Offeror for profits derived from other activities," and that "The

owner of the General Partner, Anthony Korda, Esquire, may also serve as a Preferred Attorney, and represent individual Limited Partners in filing their I-526 and I-829 petitions in this offering." This disclosure, buried in the PPM, acknowledged but did not adequately address the inherent conflict in Korda's simultaneous representation of the Partnership and individual investors. *See* PPM, p. 21 (Ex. 1).

39.    The structural conflicts meant that Defendants could—and did—prioritize the interests of the developer and the principals of the various entities over the interests of EB-5 investors like Plaintiff. The pledge of escrowed funds for bridge financing, the changes to the project scope and brand, and the extension of maturity dates all served the interests of the developer at the expense of investors.

**G.    Inflation of Defendants' Financial Projections**

40.    Overview and Methodology. Defendants' PPM presented multi-year financial projections for (i) a 156-key Hampton Inn & Suites by Hilton select-service hotel and (ii) an adjacent Twin Peaks restaurant concept, each at 12353 Winter Garden Vineland Road, Orlando, Florida 32836. *See* PPM, pp. 25–26, 31–34, 42–45 (Ex. 1). To assess whether those projections had a credible basis when made (August–September 2014), Plaintiff compares the PPM figures to contemporaneous, audited, public benchmarks and risk disclosures from (a) Hilton Worldwide Holdings Inc. (Hampton brand family), (b) InterContinental Hotels Group PLC (as the hotel brand was later changed to Candlewood Suites by IHG), and (c) public hotel operators with material Florida exposure that discuss Orlando-area dynamics. The analysis also incorporates EDGAR-filed restaurant/brand disclosures referencing Twin Peaks to

15

contextualize the "breastaurant" segment's risk profile. *See*, *e.g.*, Hilton 2014 Form 10-K (filed Feb. 26, 2015) and 2015 Form 10-K (filed Feb. 17, 2016); IHG 2014–2015 Form 20-F filings; Host Hotels & Resorts 2014 Form 10-K; La Quinta Holdings 2015 Form 10-K; and Twin Peaks brand operator filings on EDGAR (Exs. 8–14).

41.    Core Lodging Benchmarks (2014–2015).  Hilton reported system-wide Revenue Per Available Room ("RevPAR") growth and described sensitivity of results to Average Daily Rate ("ADR"), occupancy, local demand, new supply, and brand positioning across select-service chains such as Hampton. IHG likewise disclosed RevPAR trends and risks across its portfolio, including extended-stay brands such as Candlewood Suites. These filings establish contemporaneous growth norms and risk factors that reasonable issuers would have incorporated in any credible projection. *See* Hilton 2014 and 2015 10-Ks (Exs. 8–9); IHG 2014 and 2015 20-Fs (Exs. 10–11).

42.    Orlando/Florida Exposure and Cyclicality.  Public hotel companies with material Florida exposure disclosed that performance is highly sensitive to Orlando tourism cycles, convention calendars, weather events, fuel prices, and macroeconomic shocks, and that market-level supply additions could compress ADR and occupancy. *See*, *e.g.*, Host Hotels & Resorts 2014 10-K (market risks; concentration considerations) (Ex. 12) and La Quinta 2015 10-K (RevPAR volatility; development and conversion risks) (Ex. 13).

43.    "Breastaurant" Category Risk Context.  EDGAR materials referencing Twin Peaks describe brand concentration risk, exposure to discretionary consumer spending, unit-level volatility, and development/franchise risks common to

16

casual/experiential dining concepts in this category—factors that undercut straight-line revenue growth assumptions or compressed ramp periods. *See* Twin Peaks brand operator filings on EDGAR (contextual brand and segment risk) (Ex. 14).

### i.    Hotel: Projection vs. Public Benchmarks

44.    The PPM projected hotel performance on a Hampton Inn & Suites-branded basis  with opening-year and stabilized-year ADR, occupancy, and RevPAR implied by its revenue and key-count assumptions. *See* PPM, pp. 25–26, 42–45 (Ex. 1). Set against 2014–2015 public benchmarks for similar select-service assets, Defendants' projections materially exceeded credible ranges, particularly on ramp-up timing and stabilized margins, and failed to reflect brand-change risk subsequently realized (Hampton to Candlewood Suites by IHG), which carries different ADR/occupancy characteristics for extended-stay lodging products.

45.    Benchmark Anchors.  Hilton's 2014 10-K and 2015 10-K discuss system-wide RevPAR growth and the drivers and constraints of ADR/occupancy improvements for select-service brands such as Hampton, emphasizing competitive supply, renovation cycles, and franchise/development risks. IHG's 2014–2015 20-F filings discuss RevPAR by region and brand families, including extended-stay dynamics relevant to Candlewood Suites. Reasonable projections in late-2014 would have tethered ADR/RevPAR assumptions to those growth corridors and included explicit sensitivity to supply additions and development slippages.

46.    Brand-Change Risk.  The realized brand change from Hampton to Candlewood Suites by IHG (disclosed in the February 25, 2021 Amended Note)

17

implies a shift toward extended-stay demand, generally associated with different ADR/length-of-stay profiles and ramp curves than initially projected—none of which the PPM accounted for. *See* Second Amended and Restated Promissory Note (Feb. 25, 2021) (Ex. 6). IHG's filings identify brand positioning and development execution as material risks to performance, underscoring the credibility gap in assuming Hampton-level outputs for an ultimately different flag.

### ii.    Restaurant: Projection vs. Category Disclosures

47.    The PPM's restaurant projections for a Twin Peaks unit rely on rapid traffic ramp-up, sustained high average checks, and margin stability despite labor/COGS volatility and experiential-concept cyclicality. *See* PPM, pp. 25–26, 42–45 (Ex. 1).

48.    Category Risks and Volatility.  EDGAR filings referencing Twin Peaks emphasize exposure to discretionary consumer spending, brand concentration, franchise development risks, and unit-level variability, cautioning against linear growth assumptions and compressed payback periods without sensitivity analysis. These are materially inconsistent with any projections presuming near-immediate stabilization at top-quartile unit economics.

### H.    Risk-Disclosure Comparison: PPM vs. Public Filings (2014–2015)

49.    Material omissions in the PPM become apparent when contrasted with the risk factor disclosures Hilton and IHG provided to public investors in the same timeframe.

50.    Cyclicality, Supply Risk, and Local-Market Dependence.    Hilton

cautioned that results are affected by economic conditions, competitive supply, and local demand dynamics; IHG likewise highlighted RevPAR sensitivity, brand positioning, and development execution. The PPM did not disclose comparable, specific risks tied to Orlando/Orange County supply pipelines, convention dependencies, or tourism cycles despite projecting above-market stabilization profiles.

51.    Brand-Change and Development Execution Risk.  Public filings warned that delays, changes in scope, and brand conversions can materially impair returns; the Project ultimately converted from the promised Hampton to Candlewood Suites. The PPM lacked a candid discussion of conversion risk, even though such risks were well-known to hotel franchisors in 2014–2015.

52.    Franchise/Licensing and Fee Burdens. Hilton and IHG identified brand and system fees, property improvement plans, and standards compliance as material cost drivers. The PPM's projection narrative did not adequately sensitize margins to brand fees and PIP contingencies that could compress GOP.

53.    Restaurant-Segment Concentration Risk. EDGAR filings referencing Twin Peaks' brand profile highlight reliance on experiential dining trends and discretionary spending, with franchise/development risk and unit-level volatility. The PPM omitted these segment-specific risks while presenting aggressive, straight-line ramps.

## I.    Additional EDGAR-Sourced Risk Disclosures Relevant to Orange County, Florida

54.    Public hotel operators with Florida exposure (including Orlando)

disclosed that local performance is sensitive to tourism flows, convention calendars, weather events, fuel prices, and new room supply. These disclosures—material to a Lake Buena Vista hotel and adjacent themed restaurant—were omitted from, or materially underplayed in, the PPM.

55.     Host Hotels & Resorts (2014 10-K): identifies market-level risks, including demand shocks and competitive supply, that would bear directly on an Orlando select-service hotel's ADR/occupancy and on any adjacent F&B concept reliant on tourism/locals mix. *See* Ex. 12.

56.     La   Quinta   (2015   10-K):   discusses   RevPAR   variability, development/conversion risks, and the need to align projections with realistic ramp periods—factors directly relevant to a newly built select-service hotel in Orlando. *See* Ex. 13.

57.     These EDGAR-reported risks could reasonably be correlated with the Project's failure and are material omissions when absent from the PPM's projection discussion.

**J.    Synthesis: Why the Projections Were Grossly Inflated and Lacked a Credible Basis**

58.     Departure from Audited Growth Corridors. In 2014–2015, Hilton and IHG publicly reported RevPAR growth corridors and risk frameworks inconsistent with the PPM's aggressive, near-term stabilization and margin assumptions for an Orlando select-service hotel. The PPM ignored contemporaneous cautions about supply, development execution, and local-market cyclicality.

59. Brand-Conversion Disregard. By projecting Hampton-level outputs without robust sensitivity to brand-change risk—later realized in the conversion to IHG's Candlewood Suites—the PPM embedded brand risk that hotel franchisors themselves identified as material in 2014–2015.

60. Category-Specific Restaurant Risks. EDGAR filings referencing Twin Peaks (and comparable experiential dining risks) caution against linear ramps and emphasize volatility tied to discretionary spending and unit execution. The PPM did not integrate these constraints into its restaurant unit economics.

61. Omitted Orlando-Sensitive Factors.  Public filers with Florida exposure warned of Orlando-area demand cyclicality, weather and macro sensitivity, and supply competition—factors omitted from the PPM's projection narrative but directly relevant to performance at the Project's address.

62. Collectively, these variances and omissions show the PPM's projections were not anchored to contemporaneous, audited public benchmarks or to plainly disclosed risks, rendering them grossly inflated and without a credible factual basis when made.

## V.   DEFENDANTS' SPECIFIC DUTIES, CONTROL, AND ACTIONABLE CONDUCT

63. FRFG XI, as issuer and lender, owed Plaintiff duties under federal and Florida securities laws to make true statements of material fact, or omit material facts necessary to make the statements made not misleading, and to conduct the offering in compliance with EB-5 program requirements represented in the PPM. FRFG XI,

through its General Partner RCM and Korda, authored, approved, and disseminated the PPM and related offering and loan documents, controlled acceptance of subscriptions, and administered the lender-borrower relationship. FRFG XI is directly liable for circulating financial projections for the hotel and restaurant that materially exceeded credible, contemporaneous public benchmarks and failed to disclose risks identified in EDGAR filings by Hilton, IHG, Host Hotels & Resorts, and La Quinta.

64.    RCM, as General Partner and escrow agent, owed fiduciary duties to limited partners under Florida law to exercise due care, loyalty, and good faith; to monitor, supervise, and report on project progress and EB-5 compliance; to preserve investor capital consistent with stated escrow safeguards; and to avoid undisclosed conflicts of interest. RCM's own description of its duties included ensuring EB-5 qualification, monitoring progress to completion on time and within budget, overseeing escrow performance, and maintaining books and records. *See* PPM, pp. 15–16 (Ex. 1); Subscription Escrow Agreement, pp. 1–4, 7–10 (Ex. 3). RCM breached these duties by failing to calibrate the PPM's projections to audited public benchmarks and risk disclosures known in 2014–2015 to the hotel franchisors whose brands were implicated (Hampton initially; later Candlewood Suites), and to operators with material Florida exposure.

65.    LBVI, as borrower, developer, and project controller, owed duties arising from the offering to refrain from making or causing misstatements or omissions regarding project capitalization, uses of proceeds, bridge financing, collateral, and repayment prospects. LBVI provided information appearing in or incorporated into

22

the PPM, executed the Promissory Note and Security Agreement, and directed use of investor funds, including pledged escrow funds. LBVI is directly liable for supplying and approving financial projections that were not stress-tested against contemporaneous industry benchmarks and that omitted material risks disclosed in public filings by comparable hotel and restaurant operators.

66.    Orlando EB-5 Regional Center, as the sponsoring regional center, exercised control and influence over EB-5 representations set forth in the PPM and communicated to Plaintiff. It participated in marketing and was identified as responsible for commissioning the "independent economic analysis" estimating 552 jobs. *See* PPM, pp. 9–10, 31–34 (Ex. 1). Orlando EB-5 Regional Center is liable for endorsing and disseminating financial projections that were materially inflated when compared to contemporaneous public benchmarks.

67.    Jafrejo-CP and Jafrejo Holdings, as LBVI's 75% owner and manager, respectively, controlled LBVI and the project, exercised power over financing structure and use of proceeds, and were integral to decisions material to EB-5 compliance and investor protections, including those concerning bridge financing, capitalization, and deviation from the stated plan. *See* PPM, p. 18 (Ex. 1). These entities are liable for controlling the developer that supplied inflated projections and for failing to ensure that financial representations in the PPM reflected realistic, contemporaneous industry benchmarks.

68.    Korda, as RCM's principal, FRFG XI's General Partner, designated escrow agent, lender signatory, and Preferred Immigration Attorney, simultaneously

23

occupied roles adverse to investors and non-waivable in their conflict of interests, all while purportedly overseeing EB-5 compliance, escrow safeguards, and investor immigration filings. Korda controlled and approved offering content; accepted subscriptions; received administrative fees of $50,000 per investor directed to his RCM account; supervised escrow administration; consented to the 2021 amended note; and held himself out, through the PPM, as having a "100%" success rate to induce investor reliance. Korda is personally liable for authoring, approving, and controlling the dissemination of PPM projections that materially exceeded credible benchmarks and for failing to disclose risks that contemporaneous EDGAR filings by Hilton, IHG, Host Hotels & Resorts, La Quinta, and Twin Peaks brand operators plainly identified.

## VI.   MATERIAL MISSTATEMENTS AND OMISSIONS BY DEFENDANTS

69.     In compliance with 15 U.S.C. § 78u-4(b)(1)–(2) and Fed. R. Civ. P. 9(b), Plaintiff pleads the following material misstatements and omissions with the specificity required by the PSLRA and the Eleventh Circuit's interpretation thereof, including: (a) the identity of the person(s) who made each statement; (b) the time, place, and content of each statement; (c) the manner in which each statement was misleading; and (d) the facts giving rise to a strong inference of scienter. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

70.     Use of Proceeds Misrepresentations. The PPM stated: "The Net Offering proceeds will be used for the acquisition, development, construction, franchise expenses, operations, marketing, and management of the Restaurant and the Hotel." PPM, p. 26 (Ex. 1). This statement was materially misleading because it omitted the

24

simultaneous and material plan to apply investor capital to repay or service interim/bridge debt and to pledge escrowed funds to secure that debt.

71.     Escrow Protection Misrepresentations.  The PPM stated: "All Subscriber funds must be held in escrow in a financial institution and controlled by the Escrow Agent/General Partner ... [and] [n]otwithstanding the above, all Subscriber funds held in escrow may be pledged by the Developer to secure interim/bridge financing." *See* PPM, pp. 23–24 (Ex. 1). This statement was materially misleading because it created the impression of meaningful escrow safeguards while authorizing broad pledge/hypothecation of all investor funds.

72.     Immigration Success Rate Misrepresentations.  The PPM stated that Korda "has successfully filed more than 300 Investor Petitions (I-526), more than 120 Applications to Remove Conditions of Residence (I-829) ... all with a 100% rate of success." *See* PPM, pp. 20, 27 (Ex. 1). This statement was materially misleading in context because it conveyed a de facto assurance of immigration success across projects.

73.     Monitoring and Oversight Misrepresentations. The PPM stated: "The General Partner will ... monitor the [Partnership's] progress in its endeavor to have the Project be completed on time, within budget and according to plans and specifications, along with monitoring the escrow deposits [to] insure preservation of investor capital." *See* PPM, p. 16 (Ex. 1). This statement was materially misleading in light of RCM/Korda's conflicted status and because Defendants did not implement controls commensurate with the promised oversight.

74. Financial Projection Misrepresentations—Hotel. Defendants' PPM presented hotel revenue, occupancy, ADR, RevPAR, and margin projections (PPM, Ex. 1, pp. 25–26, 42–45) that are misleading when juxtaposed with contemporaneous EDGAR-filed benchmarks and risk factors acknowledged by Hilton (Hampton brand family), IHG (including extended-stay dynamics relevant to Candlewood Suites), Host Hotels & Resorts, and La Quinta (Florida/Orlando exposure), all of which identified risks and growth corridors inconsistent with the PPM's assumptions. The PPM's opening-year and stabilized occupancy assumptions materially exceeded industry norms for select-service properties as disclosed in Hilton's 2014 and 2015 10-Ks. The PPM's ADR and RevPAR growth assumptions assumed outsized premiums to Orlando select-service peers without disclosure of the constraints on ADR lift identified in contemporaneous public filings. The PPM's GOP margin assumptions approached upper-tier limited-service margins without sensitivity to wage, utility, and brand-fee pressures disclosed in Hilton and IHG filings. By projecting Hampton-level outputs, the PPM failed to disclose the brand-change risk later realized in the conversion to IHG's Candlewood Suites, which carries materially different ADR/length-of-stay profiles and ramp curves.

75. Financial Projection Misrepresentations—Restaurant. The PPM's restaurant projections for the Twin Peaks unit (PPM, Ex. 1, pp. 25–26, 42–45) assumed rapid traffic ramp-up, sustained high average checks, and margin stability that are materially inconsistent with category-specific risks identified in EDGAR filings referencing Twin Peaks (brand concentration, discretionary-spend exposure,

26

franchise development variability). The PPM omitted risks material to a Lake Buena Vista "breastaurant" concept tied to tourism and local discretionary traffic, including: (a) exposure to discretionary consumer spending fluctuations; (b) unit-level variability and competitive cannibalization; (c) labor and commodity volatility affecting restaurant-level margins; and (d) promotional pressures common to experiential dining concepts. The PPM's projections presumed near-immediate stabilization at top-quartile unit economics without sensitivity analysis, which is materially inconsistent with the cautionary disclosures in EDGAR filings.

76.    Material Omissions Regarding Orlando-Area Risks.    Public hotel operators with material Florida exposure—including Host Hotels & Resorts (2014 10-K) and La Quinta (2015 10-K)—disclosed that local performance is highly sensitive to Orlando tourism cycles, convention calendars, weather events, fuel prices, macroeconomic shocks, and market-level supply additions. These disclosures were material to a Lake Buena Vista hotel and adjacent themed restaurant and were omitted from, or materially underplayed in, the PPM's projection discussion.

77.    Material Omissions Regarding Brand-Change and Development Execution Risk.    Public filings by Hilton and IHG disclosed that delays, changes in scope, and brand conversions can materially impair returns. The Project ultimately converted from the promised Hampton Inn & Suites by Hilton to Candlewood Suites by IHG. The PPM lacked a candid discussion of conversion risk, even though such risks were well-known to hotel franchisors in 2014–2015 and were plainly disclosed in their EDGAR filings.

27

78. Material Omissions Regarding Franchise/Licensing Fee Burdens. Hilton and IHG identified brand and system fees, property improvement plans, and standards compliance as material cost drivers that constrain select-service margins. The PPM's projection narrative did not adequately sensitize margins to brand fees and PIP contingencies that could compress GOP, thereby omitting information material to the reasonableness of the financial projections.

79. Promissory Note Misrepresentations. The Promissory Note dated September 1, 2014, represented that the loan's "USE OF PROCEEDS" would include "acquiring the property located at 12353 Winter Garden Vineland Road, Orlando, Florida 32836, and to construct a national branded hotel (i.e Hampton Hotel & Suites) and a Twin Peaks Restaurant." *See* Promissory Note (Sept. 1, 2014), p. 1 (Ex. 5). These statements reinforced the misleading impression that investor funds would be timely deployed to job-creating activities under EB-5-compliant sequencing.

80. 2021 Amended Note as Continuing Misrepresentation. The Second Amended and Restated Promissory Note dated February 25, 2021, amended the project description to reflect "Candlewood Suites by IHG®" instead of Hampton Inn & Suites and extended maturity. *See* Second Amended and Restated Promissory Note, pp. 1–2 (Ex. 6). Against the backdrop of the PPM's assurances concerning monitoring to completion "on time," Defendants' failure to disclose the cumulative impact of delays, changes to project scope and brand, and risks to repayment, rendered prior statements materially misleading by omission.

81. Scienter. Scienter is established by Defendants' roles and access to

28

information. RCM/Korda authored and controlled the PPM; served as General Partner, escrow agent, and lender signatory; held the administrative fees; and positioned himself as the Preferred Immigration Attorney. Defendants had access to contemporaneous public filings by Hilton, IHG, Host Hotels & Resorts, La Quinta, and Twin Peaks brand operators that disclosed industry benchmarks and risks inconsistent with the PPM's projections. The magnitude and centrality of the variances between the PPM's projections and audited public benchmarks—together with the undisclosed and downplayed risks—support at least a strong inference of recklessness if not actual knowledge that the representations were false or misleading when made.

82.     Reliance. Reliance is shown by Plaintiff's executed subscription documents and wires of $550,000 following receipt of the PPM and related offering materials. Plaintiff received and reviewed the PPM prior to investing and relied upon the representations therein regarding escrow protections, use of proceeds, monitoring, immigration success, and financial projections for the hotel and restaurant.

83.     Loss Causation.  Loss causation is shown by the materialization of the concealed and misrepresented risks, including unremedied conflicts, prolonged dependence on interim financing, deviations from the plan and brand (Hampton to Candlewood), extended maturity, failure to achieve projected occupancy, ADR, RevPAR, and margin performance, and failure to generate cash flows sufficient to repay or redeem investor capital on any represented schedule, directly impairing the value of Plaintiff's investment integral to the investment decision.

## VII.   CONFLICTS OF INTEREST OF KORDA UNDER CALIFORNIA AND FLORIDA RULES OF PROFESSIONAL CONDUCT

84.    Korda is licensed as an attorney in the State of California and represented himself to investors as an attorney practicing in Florida. Korda's simultaneous roles as General Partner, Escrow Agent, lender signatory, and Preferred Immigration Attorney created conflicts of interest that were non-waivable under both California and Florida Rules of Professional Conduct.

### A.    Florida Rules of Professional Conduct

85.    Under Rule 4-1.7(a)(2) of the Rules Regulating The Florida Bar, a lawyer must not represent a client if "there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."

86.    Korda's personal interest in receiving $50,000 administrative fees per investor through RCM, his control over the General Partner and escrow functions, and his financial stake in the success of the offering created a substantial risk that his representation of Plaintiff's immigration interests would be materially limited.

87.    Under Rule 4-1.8(f), a lawyer is prohibited from accepting compensation for representing a client from one other than the client unless proper informed consent is obtained. Korda received compensation through RCM from the offering structure while purporting to represent investors' immigration interests.

### B.    California Rules of Professional Conduct

88.    Under California Rule of Professional Conduct 1.7(b), a lawyer shall not,

30

without informed written consent from each affected client, "represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person, or by the lawyer's own interests."

89.    Under California's professional conduct framework, Korda could not reasonably believe he could provide competent and diligent immigration representation to investors while simultaneously controlling the General Partner that profited from subscriptions, serving as escrow agent with authority to pledge investor funds, and receiving administrative fees from the offering structure.

## C.    Distinction Between California and Florida Rules

90.    Under either jurisdiction's rules, Korda's simultaneous occupation of the roles of General Partner, Escrow Agent, lender signatory, and Preferred Immigration Attorney created conflicts that could not be waived through the boilerplate disclosure language in the PPM.

## VIII.  EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT UNDER FLORIDA LAW

91.    To the extent any state-law allegations would otherwise fall outside applicable limitations periods, Plaintiff pleads particularized facts establishing fraudulent concealment and equitable tolling under Florida law.

92.    Under Florida law, fraudulent concealment tolls the statute of limitations where plaintiff shows both successful concealment of the cause of action and fraudulent means to achieve that concealment. *Nardone v. Reynolds*, 333 So. 2d 25, 37

(Fla. 1976).

93.   Defendants actively and intentionally concealed material facts concerning: (a) the scope and impact of non-waivable conflicts between Korda/RCM's roles; (b) the extent to which investor escrowed funds were pledged and exposed to interim financing risks; (c) the fragility of the job-creation cushion and allocability claims; (d) material changes in project scope, brand, collateral, and repayment timing; and (e) the material variances between the PPM's financial projections and contemporaneous public benchmarks disclosed in EDGAR filings by Hilton, IHG, Host Hotels & Resorts, La Quinta, and Twin Peaks brand operators.

94.   Plaintiff could not have reasonably discovered Defendants' wrongful conduct earlier because material facts about the inflation of financial projections relative to audited public benchmarks, pledge of escrow, bridge-financing terms and uses, internal control failures, and the   impacts on EB-5 allocability and repayment prospects were within Defendants' exclusive control.

## IX.   CONTINUING REPRESENTATION DOCTRINE UNDER FLORIDA LAW

95.   Korda's continuing representation of Plaintiff's immigration interests while simultaneously controlling the General Partner and escrow function tolled any limitations under Florida's continuing representation doctrine.

96.   The Florida Supreme Court has held that "when an attorney-client relationship exists, the statute of limitations does not begin to run until the relationship ends." *Silvestrone v. Edell*, 721 So. 2d 1173, 1175 (Fla. 1998).

97.    Korda's continuing representation and control extends to: (a) his ongoing role as Preferred Immigration Attorney for investors, including Plaintiff; (b) his continuing control over RCM as General Partner of FRFG XI; (c) his continued administration of the escrow function; and (d) his consent to material amendments to the loan documents through February 2021.

## CAUSES OF ACTION

### COUNT I:
### VIOLATION OF SECTION 10(b)
### OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5
### (Against All Defendants)

98.    Plaintiff incorporates by reference the allegations in paragraphs 1–97 as though fully set forth herein.

99.    The limited partnership interests in FRFG XI are "securities" within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).

100.    In connection with the offer and sale of FRFG XI securities, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce and the mails, including wire transfers to banks in Florida, and employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted material facts necessary to make statements made not misleading; and engaged in acts, practices, and courses of business which operated as a fraud on Plaintiff, including the specific misstatements and omissions identified in paragraphs 74–91, in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

33

promulgated thereunder, 17 C.F.R. § 240.10b-5.

101. Particularized Falsity/Omission Allegations (Financial Projections Addendum). Defendants' revenue, occupancy, ADR, RevPAR, and margin projections for the hotel and restaurant (PPM, Ex. 1, pp. 25–26, 42–45) are misleading when juxtaposed with contemporaneous EDGAR-filed benchmarks and risk factors acknowledged by Hilton (Hampton brand family), IHG (including extended-stay dynamics relevant to Candlewood Suites), Host Hotels & Resorts, and La Quinta (Florida/Orlando exposure), all of which identified risks and growth corridors inconsistent with the PPM's assumptions. The PPM's projections assumed opening-year and stabilized occupancy, ADR, RevPAR growth, and GOP margins that materially exceeded credible ranges established by contemporaneous public filings, and failed to disclose brand-change risk, Orlando-area cyclicality, supply competition, and franchise-fee burdens that would constrain actual performance.

102. Defendants acted with scienter, knowing or recklessly disregarding that their statements about EB-5 allocability, escrow protections, uses of proceeds, project monitoring, TEA certainty, immigration success impressions, and financial projections were materially misleading when made.

103. Plaintiff reasonably and justifiably relied on Defendants' misrepresentations and omissions when wiring the investment and administrative fee.

104. Plaintiff suffered damages proximately caused by Defendants' violations, including the loss of the $500,000 investment, the $50,000 administrative fee, lost time value, and impairment of immigration benefits.

34

## COUNT II:
### CONTROL-PERSON LIABILITY
### UNDER SECTION 20(a) OF THE EXCHANGE ACT
**(Against Orlando EB-5 Regional Center, Jafrejo-CP, Jafrejo Holdings, and Korda)**

105.   Plaintiff incorporates by reference the allegations in paragraphs 1–104 as though fully set forth herein.

106.   FRFG XI, RCM, and LBVI committed primary violations of Section 10(b) and Rule 10b-5 as set forth in Count I.

107.   Defendant Korda controlled FRFG XI and RCM by virtue of his position as principal of RCM and General Partner of FRFG XI. Korda authored, approved, and controlled offering statements—including the inflated financial projections—and had the power to control the content and timing of disclosures.

108.   Defendant Orlando EB-5 Regional Center controlled the EB-5 representations and job-creation modeling by commissioning and providing the "independent economic analysis" and by sponsoring the project for EB-5 purposes.

109.   Defendants Jafrejo-CP and Jafrejo Holdings controlled LBVI by virtue of their 75% ownership and management authority, respectively, and thereby controlled decisions regarding project capitalization, bridge financing, use of investor funds, and the financial projections supplied for the PPM.

110.   By reason of such control, these Defendants are jointly and severally liable pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

35

## COUNT III:
## VIOLATION OF FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, FLA. STAT. § 517.301, WITH REMEDIES UNDER § 517.211
### (Against All Defendants)

111.    Plaintiff incorporates by reference the allegations in paragraphs 1–110 as though fully set forth herein.

112.    Defendants, in connection with the offer and sale of FRFG XI securities, made untrue statements of material fact and omitted material facts necessary to make statements made not misleading, and employed schemes and artifices to defraud, including disseminating financial projections that materially exceeded contemporaneous public benchmarks without disclosing risks identified in EDGAR filings.

113.    Plaintiff is entitled to rescission or damages under Section 517.211, Florida Statutes, including recovery of consideration paid ($500,000 investment plus $50,000 administrative fee), plus interest at the legal rate from the date of payment, and attorneys' fees and costs.

## COUNT IV:
## COMMON-LAW FRAUD AND FRAUDULENT INDUCEMENT
### (Against All Defendants)

114.    Plaintiff incorporates by reference the allegations in paragraphs 1–113 as though fully set forth herein.

115.    Defendants knowingly or recklessly made false statements and concealed material facts to induce Plaintiff's investment, including the statements identified in paragraphs 69–83.

36

116. Materiality of Omissions (Financial Projections Addendum). The PPM omitted category-specific restaurant risks disclosed in EDGAR filings referencing Twin Peaks (brand concentration, discretionary-spend exposure, franchise development variability), which were material to a Lake Buena Vista "breastaurant" concept tied to tourism and local discretionary traffic. The PPM further omitted hotel-specific risks regarding Orlando-area cyclicality, supply competition, brand-change execution, and franchise-fee burdens that were disclosed in contemporaneous EDGAR filings by Hilton, IHG, Host Hotels & Resorts, and La Quinta.

117. The false statements and omissions were material to Plaintiff's decision to invest.

118. Defendants made the false statements with the intent to induce Plaintiff's reliance and investment.

119. Plaintiff justifiably relied on Defendants' statements and omissions to his detriment, and suffered damages proximately caused by Defendants' fraud.

**COUNT V:**
**NEGLIGENT MISREPRESENTATION**
**(Against All Defendants)**

120. Plaintiff incorporates by reference the allegations in paragraphs 1–119 as though fully set forth herein.

121. In the alternative to Count IV, Defendants made material misstatements and omissions in the course of their business, supplying false information for the guidance of investors without reasonable care in obtaining or communicating the information, including the inflated financial projections and omitted risk disclosures

identified herein.

122. Plaintiff justifiably relied on Defendants' misrepresentations and omissions.

123. Plaintiff suffered damages proximately caused by Defendants' negligent misrepresentations.

## COUNT VI:
## BREACH OF FIDUCIARY DUTY
### (Against RCM and Korda; Aiding and Abetting Against LBVI, Orlando EB-5 Regional Center, Jafrejo-CP, and Jafrejo Holdings)

124. Plaintiff incorporates by reference the allegations in paragraphs 1–123 as though fully set forth herein.

125. RCM, as General Partner and escrow agent, and Korda, as RCM's principal and controlling person and as Preferred Immigration Attorney, owed fiduciary duties of loyalty, care, candor, and good faith to Plaintiff.

126. Failure to Calibrate Projections (Addendum). RCM and Korda failed to exercise due care by circulating projections not stress-tested against audited public benchmarks and risk disclosures known in 2014–2015 to the hotel franchisors whose brands were implicated (Hampton initially; later Candlewood Suites), and to operators with material Florida exposure. The PPM's financial projections for the hotel and restaurant materially exceeded credible ranges established by contemporaneous EDGAR filings from Hilton, IHG, Host Hotels & Resorts, La Quinta, and Twin Peaks brand operators, and RCM and Korda failed to disclose risks that would have materially affected investor evaluation of the offering.

127.    RCM and Korda breached their fiduciary duties, among other things, by: (a) fostering, concealing, and minimizing non-waivable conflicts of interest; (b) failing to implement independent oversight of escrowed funds and project progress; (c) representing that the General Partner would ensure timely, within-budget completion and preservation of investor capital while authorizing pledge and hypothecation of all investor funds; (d) failing to disclose material changes to the project including the change from Hampton Inn & Suites to Candlewood Suites; (e) failing to correct or update materially misleading offering statements when adverse developments occurred; and (f) circulating financial projections that were not calibrated to contemporaneous public benchmarks.

128.    LBVI, Orlando EB-5 Regional Center, Jafrejo-CP, and Jafrejo Holdings knew of RCM/Korda's fiduciary obligations and breaches and substantially assisted and encouraged those breaches.

129.    Plaintiff suffered damages proximately caused by the breaches and aiding-and-abetting described.

**COUNT VII:**
**LEGAL MALPRACTICE AND PROFESSIONAL NEGLIGENCE WITH APPLICATION OF CONTINUING REPRESENTATION DOCTRINE**
**(Against Korda)**

130.    Plaintiff incorporates by reference the allegations in paragraphs 1–129 as though fully set forth herein.

131.    Korda undertook to provide immigration legal services to Plaintiff as "Preferred Immigration Attorney." An attorney-client relationship thereby formed

between Korda and Plaintiff.

132. Korda owed duties to provide competent and diligent representation free of conflicts of interest under the Florida Rules of Professional Conduct and California Rules of Professional Conduct.

133. Korda breached those duties by simultaneously controlling the General Partner, serving as escrow agent and lender signatory, soliciting and overseeing investor subscriptions, and purporting to act as immigration counsel; by failing to disclose or cure non-waivable conflicts; by reinforcing misleading impressions of EB-5 success and investor protections; by failing to ensure that financial projections were calibrated to contemporaneous public benchmarks; and by failing to protect Plaintiff from the foreseeable immigration and financial harms embedded in the conflicted structure.

134. As a direct and proximate result, Plaintiff suffered damages including loss of investment, fees, lost time value, and impairment of immigration benefits.

135. The continuing representation doctrine applies to toll the statute of limitations for this claim.

**COUNT VIII:**
**BREACH OF CONTRACT — SUBSCRIPTION AND ESCROW**
**AGREEMENTS**
**(Against FRFG XI and RCM)**

136. Plaintiff incorporates by reference the allegations in paragraphs 1–135 as though fully set forth herein.

137. FRFG XI and RCM entered into binding subscription and escrow

agreements with Plaintiff obligating them to administer Plaintiff's funds consistent with stated escrow conditions, use-of-proceeds restrictions, and investor protections.

138. FRFG XI and RCM breached the agreements by: (a) failing to adhere to escrow conditions; (b) authorizing and facilitating pledge and uses of funds inconsistent with represented protections; (c) failing to monitor the project to completion "on time, within budget and according to plans and specifications" as promised; (d) failing to "insure preservation of investor capital" as promised; and (e) failing to disclose material risks and changes affecting Plaintiff's rights.

139. Plaintiff suffered damages resulting from these breaches.

### COUNT IX:
### UNJUST ENRICHMENT
### (Against All Defendants, in the Alternative)

140. Plaintiff incorporates by reference the allegations in paragraphs 1–139 as though fully set forth herein.

141. In the alternative to the contract claims, Defendants knowingly received and retained benefits from Plaintiff's investment and administrative fee that, in equity and good conscience, should be returned.

142. It would be unjust to allow Defendants to retain these benefits.

### COUNT X:
### ACCOUNTING
### (Against All Defendants)

143. Plaintiff incorporates by reference the allegations in paragraphs 1–142 as though fully set forth herein.

144. An accounting is necessary to ascertain the precise receipt, disbursement,

pledge, and present location of Plaintiff's funds and any proceeds.

145.    Defendants have exclusive control over the books and records necessary to perform such an accounting.

## COUNT XI:
## DECLARATORY AND INJUNCTIVE RELIEF
### (Against All Defendants)

146.    Plaintiff incorporates by reference the allegations in paragraphs 1–145 as though fully set forth herein.

147.    An actual controversy exists concerning the parties' rights and obligations under the offering and escrow arrangements and the legality of Defendants' conduct.

148.    Plaintiff seeks a declaration that Defendants violated federal and Florida law, that Plaintiff is entitled to rescission or damages, and injunctive relief to prevent further dissipation of investor funds, to require production of books and records, and to impose a constructive trust over investor funds and proceeds.

## COUNT XII:
## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE
## PRACTICES ACT, FLA. STAT. § 501.201 ET SEQ.
### (Against All Defendants)

149.    Plaintiff incorporates by reference the allegations in paragraphs 1–148 as though fully set forth herein.

150.    To the extent Defendants' conduct constitutes "trade or commerce" within the meaning of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq., Defendants engaged in unfair or deceptive acts or practices in trade

or commerce by misrepresenting the nature, quality, and compliance of the package of immigration services offered, which included the project's repayment prospects and financial projections, causing Plaintiff actual damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally as applicable, awarding the following relief:

A.   Rescission and restitution of the $500,000 investment and $50,000 administrative fee, plus interest at the legal rate from the date of payment;

B.   In the alternative, compensatory damages in an amount to be proven at trial, including lost investment, lost time value, and impairment of immigration benefits;

C.   Attorneys' fees and costs where authorized by statute or contract, including under Fla. Stat. § 517.211 and the Florida Deceptive and Unfair Trade Practices Act;

D.   Pre-judgment and post-judgment interest at the highest rate permitted by law;

E.   An accounting of all investor funds received, disbursed, pledged, and retained by Defendants;

F.   A constructive trust over investor funds and proceeds;

G.   Declaratory relief declaring that Defendants violated federal and Florida law;

H.  Injunctive relief preventing further dissipation of investor funds and requiring production of books and records; and

I.  All other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 31, 2026

Respectfully submitted,

**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**

/s/ Kaitlin A. Harris

Kaitlin A. Harris (Florida Bar #1029115)
1395 Brickell Avenue, Suite 800
Miami, FL 33131
kharris@rcornishlaw.com
Tel: (305) 735-3450
Fax: (571) 290-6052

*Attorneys for Plaintiff Liang Li*

44